# STATE OF CONNECTICUT *v.* ABDULLAH SHABAZZ
## (SC 15617)

Callahan, C. J., and Borden, Berdon, Norcott and Katz, Js.

Argued March 17—officially released September 8, 1998

*William F. Gallagher*, with whom were *Patricia A. King* and, on the brief, *Cynthia C. Bott*, for the appellant (defendant).

*Robert J. Scheinblum*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *John Waddock*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The principal issue in this appeal is whether the trial court properly precluded the defendant from introducing evidence that gross medical negligence caused the victim's death. The defendant, Abdullah Shabazz, appeals[1] from the trial court's judgment of conviction, following a jury trial, of murder in violation of General Statutes § 53a-54a.[2] The defendant

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53a-54a provides: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be,

claims that the trial court improperly: (1) precluded him from introducing evidence that the gross medical negligence of the hospital that treated the victim caused the victim's death;[3] (2) excluded evidence of the presence of the victim's family at the trial; (3) excluded expert evidence of the victim's character for violence, based on the presence in the victim's body of drugs and alcohol; (4) excluded the defendant's spontaneous utterance immediately after the incident; and (5) denied his motion to disqualify the trial judge. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 3, 1994, at approximately noon, the victim, Michael Stewart, had just completed using a pay telephone located on the New Haven green, when the defendant approached the bank of telephones and began to use one of them. The victim turned toward the defendant and said, " 'Get off the phone. I beeped somebody.' " The defendant ignored the victim and began to

provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

The defendant was also convicted of carrying a dangerous weapon in violation of General Statutes § 53-206 (a). He does not challenge that conviction on appeal.

[3] This was the second trial proceeding on these charges against the defendant. The case previously had been scheduled for a jury trial before the trial court, *Fracasse, J.*, who granted the state's motion in limine to exclude expert testimony that the defendant intended to introduce, purporting to establish that the gross negligence of Yale-New Haven Hospital, rather than the defendant's conduct, caused the victim's death. Thereafter, during jury selection, the defendant, who had been released on bond, failed to appear, and the trial court declared a mistrial. Following his rearrest, the defendant was brought to trial in the present case. The trial court, *Licari, J.*, adopted the prior ruling of Judge Fracasse as the law of the case.

dial. The victim then slapped the defendant in the face, the defendant punched the victim, and a fistfight ensued. As the fight quickly progressed, the victim tried to get away from the defendant, but the defendant would not let him go. Instead, the defendant produced a switchblade knife and, holding the victim so that he could not escape, repeatedly stabbed the victim. When the victim collapsed to the ground, the defendant paused momentarily and then continued to attack the victim with the knife while the victim was on the ground. The defendant then sat on top of the victim, who was not fighting back and was coughing and bleeding, and continued to stab him with the knife until a New Haven police officer arrived and disarmed the defendant.

The victim was taken to Yale-New Haven Hospital, where he died approximately twelve hours later. An autopsy revealed stab wounds on the victim's face, the left side of his shoulder, the bottom of his left shoulder, his left arm, his forehead, his chest and his abdomen. With respect to the abdominal wound, the knife had passed through the abdominal wall and through the entire length of the liver, and there was also a second, separate wound on the liver. With respect to the chest wound, the knife had passed through the rib cage and punctured the lung. The victim died as a result of the stab wounds to his chest and abdomen.

At trial, the defendant raised three theories of defense. He claimed that he had acted in self-defense. This claim was based on his testimony, which is discussed in more detail in part III of this opinion. He also claimed, based on his testimony, that he had no intent to kill, and that the victim was stabbed accidentally as they tussled on the ground. Finally, the defendant claimed, primarily based on the expert testimony of James Merikangas, a physician certified in both neurology and psychiatry, that he was entitled to the affirmative defense of extreme emotional disturbance so as to

reduce his guilt to manslaughter. The jury rejected all of these theories of defense, and found the defendant guilty of murder. The trial court rendered judgment on the verdict accordingly. This appeal followed.

I

The defendant first claims that the trial court improperly precluded him from introducing evidence that the gross negligence of the hospital caused the victim's death. We disagree.

It was undisputed that the victim had been admitted to the Yale-New Haven Hospital emergency room at 12:24 p.m., on May 3, 1994, and that he arrived in the operating room at approximately 1 p.m., where he underwent surgery between 1 p.m. and 3 p.m. The victim was then placed in a postoperative recovery room, where he was monitored until approximately 7 p.m., after which he was placed in a postanesthesia care unit for a short period of time. Finally, the victim was placed in a regular floor room at approximately 8 p.m. The victim died early in the morning of May 4, 1994.

Before his first trial, the defendant filed a notice of intention to introduce expert medical testimony that the gross negligence of the hospital, rather than the defendant's conduct, caused the victim's death. The state filed a motion in limine to preclude any such evidence, based on the decision in State v. Jacobs, 194 Conn. 119, 479 A.2d 226 (1984), cert. denied, 469 U.S. 1190, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985).

Pursuant to the motion in limine, the first trial court, Fracasse, J., held an evidentiary hearing. The defendant made the following evidentiary offer of proof. William Martin Stahl, a general surgeon specializing in trauma surgery, had examined the victim's death certificate, autopsy report and hospital records. Stahl testified that

the hospital had been grossly negligent by: (1) administering 5000 units of heparin, an anticoagulant, to the victim immediately after the surgery; and (2) sending him from the postanesthesia unit to a regular room, rather than to an intensive care unit. In Stahl's opinion, the use of an anticoagulant was "contraindicated totally when you have a liver injury because you want the blood to clot. You don't want him to be anticoagulant." Further, in Stahl's opinion, the victim had bled to death, and had he been monitored in an intensive care unit "with vital signs done every fifteen minutes, watching his urine output every half hour, repeating his blood gases," his bleeding would have been disclosed. It was Stahl's opinion that had the hospital's conduct been proper, the victim would have had a "better than 90 percent chance" of surviving his liver injury. Stahl also testified, however, that without treatment the victim's stab wounds would have been fatal. Moreover, Stahl conceded that, of patients suffering from stab wounds to the liver, only 10 to 15 percent ordinarily are placed in intensive care following surgery.

The defendant also produced Cyril H. Wecht, a physician specializing in anatomic, clinical and forensic pathology, who also had reviewed the death certificate, autopsy report and hospital records. Wecht testified that the victim's death was caused by cardiac arrhythmia, or an abnormal heart beat, precipitated by loss of blood, metabolic acidosis, drug abuse, the presence of morphine and cocaine, and an enlarged heart. Wecht agreed with Stahl that heparin should not have been administered to the victim, and that the failure to send him to intensive care, where he would have been more closely monitored, was grossly negligent, leading to his ultimate death. Wecht also testified, however, that it was the stab wounds to the victim's liver and heart that had caused the cardiac arrhythmia, which was the

immediate cause of his death. In addition, Wecht testified that the medical charts indicated that heparin had *not* been administered to the victim. Wecht conceded, therefore, that heparin could not have contributed to the victim's death. Wecht testified further that postoperative recovery rooms similar to the victim's often are as good or better than intensive care units for purposes of closely monitoring a patient's vital signs, and that the victim's vital signs had been monitored regularly.

Judge Fracasse granted the state's motion in limine. Thereafter, at the defendant's trial, the trial court, *Licari, J.*, agreed with Judge Fracasse's ruling, and adopted it as the law of the case.

In the state's case-in-chief, Malka Shah, an associate medical examiner of the state of Connecticut, who had performed the autopsy on the victim, testified that the victim had died as a result of stab wounds to his liver and left lung. She also testified that he had bled to death "[s]econdary to his injuries . . . ." When the defendant attempted to cross-examine her regarding the effect on the victim's demise as a result of the treatment at Yale-New Haven Hospital, the trial court sustained the state's objection on the basis of the ruling on the state's motion in limine.

The defendant claims that these rulings were improper because: (1) our prevailing case law permits evidence of gross medical negligence as an intervening cause of death, the ultimate determination of which is for the jury; and (2) in the alternative, we should "adopt the rule that grossly negligent medical treatment is sufficient to break the chain of causation . . . ."[4] We are not persuaded by the defendant's argument.

---

[4] The defendant also claims that the failure to permit such evidence deprived him of his federal constitutional right to present a defense. This claim does not advance the defendant's argument. The constitutional right to present a defense does not include the right to introduce any and all evidence claimed to support it. *State* v. *Bova*, 240 Conn. 210, 236, 690 A.2d

This claim is controlled by our decision in *State* v. *Jacobs*, supra, 194 Conn. 125–26. In that case, we thoroughly reviewed our case law on the question, and reiterated the generally recognized rule that "where death ensues from a dangerous wound inflicted upon another, it is ordinarily no defense that unskilled or negligent medical treatment aggravated the injury." Id., 124. Moreover, we noted that this rule was "in accord with the majority position in other states on this issue." Id. In addition, we specifically cited with approval the proposition that "where a wound, either operating directly or indirectly, by causing some other condition which produces death, has been a substantial factor in causing a death, it is still to be regarded as the cause of the death even though some negligence in the treatment of the wounded man by physicians and others is also a contributing factor. *Gross maltreatment by attending physicians constitutes a defense only in the exceptional case where that maltreatment is the sole cause of the victim's death.*" (Emphasis added; internal quotation marks omitted.) Id., 125–26.

In the present case, there was no evidence from which the jury rationally could have inferred that the hospital's gross negligence was the sole cause of the victim's death. Both Stahl and Wecht acknowledged that the stab wounds inflicted by the defendant would have been fatal in the absence of any medical treatment. At the most, the purported gross negligence would have been a contributing cause of the death, not the sole

1370 (1997) ("When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . Although exclusionary rules of evidence should not be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes." [Citations omitted; internal quotation marks omitted.]). The trial court retains the power to rule on the admissibility of evidence pursuant to traditional evidentiary standards. Id. Thus, the question of the admissibility of the proffered evidence is one of evidentiary, but not constitutional, dimension.

cause. This would be insufficient under *Jacobs*. The trial court, therefore, properly granted the state's motion in limine and properly sustained the state's objection to the defendant's attempted cross-examination of Shah.

Contrary to the defendant's contention, moreover, this court did not implicitly overrule *Jacobs* in *State* v. *Munoz*, 233 Conn. 106, 114–27, 659 A.2d 683 (1995). In *Munoz*, there was evidence that the defendant stabbed the victim to death. Id., 109. There was also contrary evidence, however, that the wounds inflicted on the victim were not fatal, and that a third person had inflicted the fatal wounds and transported the body to where it was ultimately found. Id., 115. Moreover, the defendant had also provided evidence tending to show that he was somewhere else at the time of the infliction of the fatal wounds. Id. Under those circumstances, this court held that the trial court improperly had failed to include an instruction on the concept of intervening cause. Id., 120. We did so primarily because there were two closely linked interpretations of the evidence that were susceptible of a determination by the jury that the defendant was not responsible for the victim's death, namely: (1) the defendant's stabbing of the victim had not inflicted a potentially fatal wound; and (2) the state's proof of the defendant's fatal stabbing of the victim "was sufficiently inconclusive as to give rise to a reasonable doubt, based on the doctrine of efficient, intervening cause, about whether the defendant's conduct was the proximate cause of [the victim's] death." Id., 122.[5]

---

[5] It is true that in reviewing the evidence supporting the claimed jury instruction, we also noted a possible interpretation of the evidence suggesting that although the defendant may have inflicted one of the fatal wounds, "some third party's conduct in inflicting additional stab wounds, in the defendant's absence, was so significant that it amounted to an efficient, intervening cause . . . ." *State* v. *Munoz*, supra, 233 Conn. 122. Upon reflection, we conclude that this language was ill-advised, and we now disavow it. First, such a theory was not necessary to the decision because there was evidence that the wound inflicted by the defendant was not fatal at all. That alone would have compelled an instruction on the doctrine of efficient,

Thus, *Munoz* is distinguishable from the present case. First, unlike the present case, *Munoz* did not involve a claim of intervening medical negligence. Second, unlike the present case, *Munoz* rested primarily on the fact that the jury reasonably could have inferred from the evidence that the intervening criminal conduct was the *sole* proximate cause of the victim's death.

Finally, we are not persuaded that we should overrule *Jacobs*. In our view, *Jacobs* expresses a sound rule of law, which is consistent with the general rule of causation in criminal cases. We see no sound reason of policy why a defendant who has committed a homicidal act should escape criminal liability simply because the hospital to which the victim was taken contributed to the death by its purportedly grossly negligent conduct. The rule articulated in *State* v. *Jacobs,* supra, 194 Conn. 126, namely, that such gross negligence may permit the defendant to escape liability when it was the sole cause of the death, strikes an appropriate balance between the notions of criminal responsibility for one's conduct, on one hand, and intervening cause, on the other.

## II

The defendant next claims that the trial court improperly excluded evidence of the presence of the victim's family at the trial and of their knowledge that the victim's estate had filed a medical malpractice action against the hospital. This claim is without merit.

intervening cause because, although under that theory of the evidence the defendant's conduct was a "but for" cause of the victim's death, the jury could have found that it was not a *proximate* cause of the death. Second, that language is contrary to the well established doctrine of proximate causation in criminal cases, to which we later referred in *Munoz,* that " '[e]very person is held to be responsible for the natural consequences of his acts, and if he commits a felonious act and death follows, it does not alter its nature or diminish its criminality to prove that other causes cooperated to produce that result.' " Id., 126.

The victim's sister, Darnez Poole, was working as an intake specialist in the hospital emergency room when the victim was taken there. She testified to having seen him in the recovery room following his surgery, and later in the evening after he had died.

On cross-examination of Poole, the defendant, in the absence of the jury, made the following offer of proof. He proposed to elicit that: (1) other members of the victim's family were attending the trial "because of their perception that [the defendant] caused the death of [the victim]"; and (2) the family members knew that the fiduciary of the victim's estate had "brought a lawsuit against Yale-New Haven Hospital blaming the hospital for [the victim's] death." The claimed relevance was that their presence at the trial indicated their blame of the defendant for the death, and the lawsuit was "an act that is inconsistent with that" blame. The state objected on the ground of relevancy, and the trial court sustained the objection.

On appeal, the defendant argues that the evidence was "relevant to the cause of death." Even if we were to assume without deciding that an inference rationally could have been drawn, from the attendance of members of the victim's family at the trial, regarding their opinion of who caused the death, we fail to see how that purported opinion was relevant to the cause of the victim's death. None of the family members witnessed the stabbing, and none had any medical or other expert qualifications that would have rendered his or her opinion on causation admissible. The trial court did not abuse its discretion in sustaining the state's objection.

### III

The defendant next claims that the trial court committed reversible error by sustaining the state's objection to certain evidence that he had offered to prove the violent character of the victim. We disagree.

In an offer of proof outside the presence of the jury, the defendant offered the testimony of Merikangas. Merikangas had examined the hospital records of the treatment of the victim following the fatal encounter. On the basis of those records, Merikangas gave his opinion that the victim "was, in all probability, the aggressor" in the fight with the defendant.[6]

The defendant argued to the trial court that this testimony was admissible to prove that the victim was the aggressor in the fight, under our decisions in *State* v. *Carter*, 228 Conn. 412, 423, 636 A.2d 821 (1994), and *State* v. *Miranda*, 176 Conn. 107, 109–14, 405 A.2d 622 (1978). The state objected. The court sustained the state's objection, reasoning that: (1) the evidence was not the kind of opinion evidence sanctioned by those two cases; (2) the evidence was cumulative because the state conceded that the victim was the initial aggressor in the fight; (3) the evidence was unduly inflammatory and prejudicial; and (4) even if otherwise admissible despite these reasons, the defendant had

---

[6] In support of that opinion, Merikangas testified that at the time of the incident, the victim's body contained cocaine, morphine and alcohol, and that the victim had been using five or six bags of heroin and drinking a six pack of beer daily. Merikangas linked the morphine found in the victim's system with his heroin use by testifying that heroin "tests as morphine . . . ." Merikangas testified further that the effect of the combination of cocaine, morphine and alcohol "is to prolong the effect of the cocaine . . . so that the cocaine high lasts longer than it would" otherwise; the effect of "simultaneous use of opiates like morphine with cocaine" is to make the intravenous drug user "get high and feel good at the same time"; and the use of these substances increases "the likelihood that [the victim] was the aggressor" because "alcohol reduces one's impulse control . . . and cocaine, particularly, acutely causes violence . . . ." Although Merikangas did not quantify the amount of cocaine or morphine in the victim's system, he testified that "he was not intoxicated on alcohol, [the amount] was a third of the legal [level of] intoxication."

Merikangas also based his opinion on the fact that the victim's system contained meperidine, which is the generic name for Demerol. There was evidence, however, that the victim had been administered Demerol at the hospital.

not laid a sufficient foundation for the admissibility of the evidence.

In *State* v. *Miranda*, supra, 176 Conn. 109, we reiterated the general rule that, in a homicide trial, "the character of the deceased ordinarily is irrelevant to the accused's guilt or innocence." Addressing anew "the question of the admissibility of convictions [of the victim] of crimes of violence . . . [we held] that the nature of such evidence and the victim's absence from the trial warrant a narrow exception to the rule that conduct may not be used to prove character." Id., 113. We therefore held "that in a homicide prosecution where the accused has claimed self-defense, the accused may show that the deceased was the aggressor by proving the deceased's alleged character for violence. The deceased's character may be proved by reputation testimony, by opinion testimony, or by evidence of the deceased's convictions of crimes of violence, irrespective of whether the accused knew of the deceased's violent character or of the particular evidence adduced at the time of the death-dealing encounter." Id., 114. We reaffirmed that holding in *State* v. *Carter*, supra, 228 Conn. 423.

The defendant's principal claim in this regard[7] is that the trial court abused its discretion in excluding the evidence offered because it was opinion testimony of the victim's violent character within the rubric of *Miranda* and *Carter*. We need not decide whether the

---

[7] The defendant also claims that the exclusion of the evidence offered deprived him of his constitutional right to present his defense of self-defense. This claim is untenable. The right to present a defense does not compel the admission of any and all evidence offered for that purpose. *State* v. *Bova*, 240 Conn. 210, 236, 690 A.2d 1370 (1997). The trial court retains the discretion to rule on the admissibility, under the traditional rules of evidence, regarding the defense offered. Id. The defendant was adequately permitted to present his claim of self-defense by way of his own testimony, by cross-examining the state's witnesses, and by the opportunity to present any other relevant and admissible evidence bearing on that question.

evidence was admissible, however, because even if we were to assume without deciding that the trial court abused its discretion in excluding the evidence, its exclusion constituted harmless error.

Because this assumed trial court impropriety is not constitutional in nature, the defendant has the appellate burden to establish harm flowing from the error, in order to secure a reversal of the judgment. We recognize that we have not been fully consistent in our articulation of the standard for establishing harm. One line of cases states that the defendant must establish "that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *McIntyre*, 242 Conn. 318, 329, 699 A.2d 911 (1997); *State* v. *Wilkes*, 236 Conn. 176, 188, 671 A.2d 1296 (1996); *State* v. *Cavell*, 235 Conn. 711, 721–22, 670 A.2d 261 (1996). Another line of cases states that the defendant must establish that the trial court error caused him "substantial prejudice." *State* v. *Askew*, 245 Conn. 351, 371, 716 A.2d 36 (1998). We need not resolve this difference in formulation in the present case, nor need we determine whether there is any functional difference between the two formulations, because we conclude that the defendant has failed to sustain his burden under either standard.

First, there was no dispute at trial that the victim had been the aggressor in the encounter. The state, when it objected to the evidence, specifically conceded that to be the case. The state's evidence was that the fight started by the victim slapping the defendant in the face, and the defendant testified to the same effect. In his final argument to the jury, the defendant, in making reference to the slapping incident that *started* the fight, asserted that there was no dispute about the fact that the victim was "the aggressor" in the fight with the

defendant.[8] The state in response supported that assertion by stating, "I certainly am not going to suggest to you that [the victim] used appropriate behavior when he slapped [the defendant while the defendant was using the telephone]." Indeed, our examination of the transcript of both the final arguments of the parties and the jury instructions indicates that the question of who was the aggressor was not an issue in dispute in the case.[9] Furthermore, the defendant did introduce, under *Carter* and *Miranda*, evidence of the victim's 1991 conviction for threatening. Thus, there was other evidence of the victim's violent character. Consequently, the excluded evidence was cumulative to what was already before the jury, and concerned an issue that was not in dispute.[10]

Second, the defendant's evidence in support of his claim of self-defense was thin, and the state's contrary

[8] The defendant began his final argument with the assertion that there was "no question . . . that [the victim] was the aggressor. Monique [McNeil] said that he hung up the phone and slapped [the defendant] in the face. . . . There wasn't any other testimony . . . ." Later in his argument, the defendant repeated the assertion: "There are a lot of agreed facts as to how this occurred. . . . We know that [the victim] was the aggressor."

[9] Although the state *did* contest the defendant's claim that the victim had pulled something from the trash can, fairly read, the record strongly indicates that that dispute was not related to the issue of who was the aggressor. It cannot plausibly be contended, therefore, as the dissent of Justice Katz suggests, that when the parties were arguing to the trial court regarding who was "the aggressor," they were referring to the victim's putting his hand into the trash can, instead of who started the fight.

[10] By contrast to the question of who was the aggressor, which was not in dispute, the question of whether the defendant could have retreated with complete safety without using deadly force, like the issue of whether the defendant had pulled something from the trash can, *was* in dispute. See General Statutes § 53a-19 (b) ("a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety [1] by retreating"). The state's claim in this regard was based on the evidence that, before he inflicted the fatal stab wounds, the defendant was winning the fight and was sitting on the prostrate and helpless victim, stabbing him. The defendant did not claim, however, that Merikangas' testimony was relevant to the question of whether the defendant could have retreated with complete safety.

evidence was very strong. The only evidence in support of his claim was his own testimony.[11] The defendant testified that at some point during the fight, the victim reached into a trash can and "tried to pick something up out of the garbage can," which the defendant believed to be a gun. The defendant then testified that in order to prevent the victim from pulling the gun from the can, the defendant stabbed the victim with the *defendant's own* switchblade knife, and the victim then dropped the gun back into the garbage can. According to the defendant, after he had stabbed the victim only once, the victim grabbed him, wrestled him to the ground, and somehow got on top of the defendant. At this point, in the defendant's version of the incident, a police officer arrived, said " '[g]ive me the knife,' " and the defendant complied.

This testimony of the defendant was contradicted by the physical evidence, by the eyewitness testimony of three witnesses, and by certain rebuttal testimony of the state concerning the statements of the defendant in his interview with the police shortly after the fight. The physical evidence was that the victim had suffered *numerous* stab wounds, not one as the defendant testified. There were wounds on the left side of his face, two on his left shoulder, two on his left arm, on his forehead, on his chest, and one abdominal wound that had resulted in two separate stab wounds to his liver, indicating rapid, successive knife thrusts. The fatal stab wounds were those to his chest and abdomen. The defendant, by contrast, was not injured. In addition, a search of the scene immediately after the incident by Detective William Badger of the New Haven police department, who was also an eyewitness to the encounter, did not disclose any other weapon.

[11] Furthermore, the defendant's credibility was impeached on cross-examination by introduction of his prior convictions for robbery in the first degree, an unspecified felony, and six misdemeanor larceny offenses of varying degrees.

The eyewitness testimony was as follows. Monique McNeil was an eyewitness to the beginning and to much of the ensuing course of the encounter between the defendant and the victim. She testified that after the fight had started by the victim slapping the defendant in the face, the victim had tried to get away from the defendant, who would not let him go. Although she saw the victim reach into a trash can and withdraw his hand, she did not see anything in his hand. After turning away and then turning back, she also saw the defendant sitting on top of the victim and stabbing him, while the victim was lying on the ground coughing and bleeding.

Martin Tchakirides was another eyewitness. He testified that he was driving his car on Temple Street when loud voices from the direction of the pay telephones drew his attention. He was only forty to sixty feet away when he saw the fight begin. He testified that when the defendant displayed a knife, the victim tried to pull away from him, but the defendant "had a hold of him," and would not let the victim go. Tchakirides saw the defendant repeatedly slash and stab the victim, who was trying to defend himself. He also saw the victim collapse to the ground, followed by the defendant's attacking him while he was lying defenseless on the ground.

The third eyewitness was Badger, a thirty year veteran of the New Haven police department. He was sitting in his police car on Temple Street approximately twenty-five feet away, when he saw the defendant attack the victim. When Badger first noticed the fight, he testified, the defendant was sitting astride the victim, "straddling him, like he was riding a horse," and while the victim was under the defendant and was not fighting back, the defendant stabbed him twice with his switchblade knife. As the defendant was about to stab the victim again, Badger "grabbed his arm," identified

himself as a police officer and, contrary to the defendant's testimony that he complied with the officer's request to give up the knife, Badger "took [the knife] from" the defendant.

Furthermore, in rebuttal the state introduced evidence that when first interviewed by the police, the defendant described the details of the fight with the victim and claimed that he had stabbed the victim in self-defense. He did not, however, mention that the victim had reached into a trash can. Also, in that interview, when asked specifically whether the victim had a weapon, the defendant answered that "he never saw nor was any other weapon used."

Finally, we note that in addition to self-defense, the defendant raised two inconsistent, alternative theories of defense. First, he claimed that he had no intent to kill and that the victim was stabbed accidentally as they tussled on the ground. Second, he raised the affirmative defense of extreme emotional disturbance, which was factually inconsistent with his defense of the justified use of deadly force in self-defense. The defendant had the burden, under this claim, of establishing by a preponderance of the evidence that the reason he killed the victim was, not because he reasonably believed that he was subject to deadly physical force and could not safely retreat; see General Statutes § 53a-19;[12] but

[12] General Statutes § 53a-19 provides: "Use of physical force in defense of person. (a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat

because he was subject to an extreme emotional disturbance, and his intentional killing of the victim resulted from a loss of "self-control, and [his] reason [being] overborne by intense feelings such as passion, anger, distress, grief, excessive agitation or other similar emotions." *State* v. *Elliott*, 177 Conn. 1, 9, 411 A.2d 3 (1979); see General Statutes § 53a-54a. Thus, the defendant claimed, his intentional homicide should be mitigated, and reduced to manslaughter.

Although it is true that a defendant is legally permitted to raise inconsistent defenses, when he does so, a jury, applying its common sense, is entitled to view with skepticism the persuasiveness of all of the defenses. See *State* v. *Person*, 236 Conn. 342, 359, 673 A.2d 463 (1996) (defendant's presentation of inconsistent defenses may be "self-penalizing . . . because it will . . . encourage jury skepticism about his entire defense" [citation omitted; internal quotation marks omitted] [*Borden, J.,* concurring]); see also *State* v. *Munoz*, supra, 233 Conn. 114–15 n.5 ("[a]lthough the law permits, for reasons of policy, the assertion of inconsistent defenses, such as self-defense and alibi, and although lawyers and judges are accustomed to dealing with such defenses independently of each other, one must wonder about the effect

if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

on a thoughtful jury of the simultaneous claims that 'I did it in self-defense,' and 'I was not there at the time' "). In the present case, the jury was presented with simultaneous claims by the defendant alleging that: (1) "I intentionally stabbed him because I reasonably believed it was necessary to save my own life"; (2) "I did not really intentionally stab him at all"; and (3) "I intentionally stabbed him only because I was overcome by extreme and intense feelings that were not normal for me." Faced with such a basket of inconsistent purported states of mind,[13] the jury was quite likely to have rejected them all.

In view of all of this evidence, the defendant has not established that the exclusion of the proffered evidence constituted harmful error. The defendant has established neither that, had the trial court admitted Merikangas' testimony, it is more probable than not that the jury's verdict would have been different, nor that the exclusion of that evidence caused him substantial prejudice.[14] Therefore, the defendant cannot prevail on this claim.

[13] The dissent of Justice Katz asserts that these are "related *but not inconsistent* claims regarding [the defendant's] mental state at the time that he, admittedly, stabbed the victim." (Emphasis added.) See footnote 7 of this dissenting opinion. It is true that, as the dissent suggests, they are not *as* inconsistent as, " 'I did it in self-defense,' " and " 'I was not there at the time.' " *State* v. *Munoz*, supra, 233 Conn. 114–15 n.5. Only a lawyer or, apparently, a judge, however—and certainly not a jury applying its common sense understanding of human behavior—might argue with a straight face that the three purported states of mind that the defendant claimed in his defense are "not inconsistent" with each other. We are not so willing to suspend our common sense.

[14] We note that in her dissent, Justice Katz' argument for harmful error does not explain how Merikangas' testimony was likely to have made a difference—under any standard of harmfulness—on the question of whether the victim, because of his violent character, was likely to have, in fact, reached into the trash can and pulled out a gun or something resembling a gun, and then dropped the gun back into the trash can. Under this claim of harmfulness, one would have to assume that the jury was likely, because of Merikangas' testimony, to believe that the victim's violent character caused him to reach into a public trash can at noon on the New Haven

## IV

The defendant's next claim is that the trial court improperly excluded his purportedly spontaneous utterance to Badger immediately after the incident. We are not persuaded that the trial court abused its discretion in this ruling.

In response to the state's motion in limine, the court held a hearing on the admissibility of this evidence in the absence of the jury. Badger testified that after he had verbally identified himself as a police officer and after he had taken the knife from the defendant and showed the defendant his police badge, as the defendant was getting up off of the victim the defendant said to Badger, "[h]e started it," and told Badger that he was defending himself. The defendant offered this hearsay statement of the defendant under the spontaneous utterance exception to the hearsay rule, and the court sustained the state's objection on the ground that there was a sufficient interval for reflection and that the defendant had not established that his statements were spontaneous utterances.

"Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge." *State* v. *Stange*, 212 Conn. 612, 617, 563 A.2d 681 (1989). The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal "absent an unreasonable exercise of discretion." Id. Furthermore, although the time period between the occurrence and the utterance is important, it is not dispositive. The trial

green to pull out a gun—the existence of which the defendant disclaimed to the police shortly after the fight. This scenario presupposes that the victim somehow knew that there was such a gun in the trash can, presumably either because he had stashed it there beforehand or because he knew that someone else had done so. Neither scenario commends itself to us as one that a jury was likely to believe simply because of Merikangas' testimony.

court is entitled to take all the factual circumstances into account "when deciding the preliminary question of whether a statement was spontaneous." Id., 618.

We cannot conclude that the trial court abused its broad discretion in determining that the statements did not qualify as spontaneous utterances. The statements were exculpatory and were made after the defendant was aware that he was speaking to a police officer who had witnessed at least part of his encounter with the victim. Thus, he had the motive and time to fabricate, and the trial court was justified in determining that he had not precluded "contrivance and misrepresentation." Id., 617.[15]

## V

The defendant's final claim is that the trial court improperly denied his pretrial motion to disqualify Judge Licari from presiding over the trial. We disagree.

The basis of the defendant's motion was that Judge Licari's father had been murdered in New Haven in 1991 by an African-American, and that these circumstances gave rise to an appearance of bias,[16] in violation of canon 3 (c) of the Code of Judicial Conduct,[17] because the defendant is an African-American. The state opposed the motion on the ground that it was untimely

[15] Furthermore, even if we were to determine that the trial court abused its discretion in this ruling, it would have been harmless because the defendant ultimately testified that when Badger came upon the scene, he told Badger, "I was only defending myself."

[16] The defendant specifically disavows any suggestion of actual bias on the part of Judge Licari, and relies solely on the assertion of an appearance of bias.

[17] Canon 3 (c) of the Code of Judicial Conduct provides in relevant part: "(c) Disqualification.

"(1) A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

"(A) the judge has a personal bias or prejudice concerning a party . . . ."

because jury selection had begun, and on its merits. The trial court denied the motion, both on the ground of timeliness[18] and on its merits. Even if we were to assume without deciding that the defendant's motion was timely, we conclude that the trial court properly denied the motion.

The standard for such a determination is well established. "The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. In Connecticut, the disqualification of judges is governed by General Statutes § 51-39[19] and Canon 3 [c] of the Code of Judicial Conduct. Under Canon 3 [c] (1) of the Code of Judicial Conduct [a] judge should disqualify himself [or herself] in a proceeding in which his [or

[18] Practice Book § 1-23, formerly § 997, provides: "A motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. The motion shall be filed no less than ten days before the time the case is called for trial or hearing, unless good cause is shown for failure to file within such time."

Judge Licari acknowledged that the defendant had not had ten days notice that the case would be tried before him. Noting, however, that by the time the defendant made the motion, he had made other rulings adverse to the defendant, and that because his father had died in 1991, the defendant had ample opportunity to make the motion prior to jury selection, Judge Licari concluded that the motion was untimely. Judge Licari also addressed the merits of the motion, however, and denied it.

[19] General Statutes § 51-39 provides: "Disqualification by relationship or interest. Judge or family support magistrate may act with consent of parties. (a) Except as provided in this section, a judge or family support magistrate is disqualified to act if a relationship between the judge or family support magistrate and a party in any proceeding in court before him is as near as the degree of kinship between father and son, brothers, or uncle and nephew, by nature or marriage, or as near as between landlord and tenant, or if any judge or family support magistrate may be liable to contribute to the damages, costs or expenses of any proceeding before him, or if he may receive a direct pecuniary benefit by the determination of any proceeding before him.

"(b) A judge or family support magistrate shall not be disqualified to act in any proceeding by reason of his being a member of any ecclesiastical corporation, unless it is a party to the action, nor in any proceeding in which

her] impartiality might *reasonably* be questioned . . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . Thode, Reporter's Notes to Code of Judicial Conduct (1973), pp. 60–61. The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his [or her] impartiality, on the basis of all of the circumstances." (Emphasis in original; internal quotation marks omitted.) *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 744–46, 444 A.2d 196 (1982).

The core of the defendant's claim is the assertion that a reasonable person might question the impartiality of a trial judge with respect to an African-American who has been charged with murder because the father of the judge had been killed in a robbery by an African-American. Judge Licari characterized the defendant's assertion as "raw speculation." We agree. In our view, it would not be reasonable for a person to question a judge's impartiality in a trial for a serious crime committed by a member of a particular racial group simply because the judge's close relative was the victim of a similar crime committed by a member of the same racial group. Such a perception, if held, would be based on

---

any town, city or borough is interested or is a party, by reason of his being an inhabitant thereof or liable to taxation therein or by reason of his being related to any taxpayer or inhabitant thereof.

"(c) When any judge or family support magistrate is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court."

nothing but speculation, and not on any reasonable basis.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and NORCOTT, J., concurred.

BERDON, J., dissenting. I agree with Justice Katz's well reasoned dissent, which concludes that the defendant's conviction should be reversed because the trial court incorrectly excluded expert testimony demonstrating that the likelihood that the victim behaved violently was increased by his having been under the influence of drugs and alcohol at the time of the altercation. I write separately because I also disagree with the majority's conclusion that the trial court properly excluded relevant evidence tending to show that the gross negligence of Yale-New Haven Hospital (hospital) was the cause of the victim's death.

If the trial court had allowed the defendant, Abdullah Shabazz, to introduce all of the evidence relevant to the cause of death of the victim, Michael Stewart, the jury could have found that the negligence of the hospital was an intervening act that caused the victim's death. Specifically, the jury could have found that the proximate cause of the victim's death was not the stab wound inflicted upon him by the defendant, but, rather, the hospital's gross negligence in: (1) failing to monitor him in an intensive care setting; (2) failing to discover and suture a stab wound to his liver; and (3) administering anticoagulant medication to him—conduct that resulted in his bleeding to death.

At the hearing in limine to determine the admissibility of evidence, the defendant proffered the testimony of two leading physicians that would have provided a basis upon which the jury could have found that the gross negligence of the hospital was the efficient, intervening

cause of the victim's death. First, the defendant prof-
fered the testimony of William Martin Stahl, a physician
specializing in trauma surgery.[1] Stahl testified that the
victim's major injury was a stab wound to his liver that
was treated properly and that after the operation no
further bleeding was indicated. Stahl further testified,
however, that the hospital breached the standard of
care for a trauma patient because it failed to place the
victim in a monitored environment for at least twenty-
four hours after his operation and that, instead, hospital
personnel sent the victim to an unmonitored hospital
bed (floor).

Specifically, Stahl testified that: "[T]his is not the type
of patient with that degree of bleeding requiring four
units of blood, liver lacerations are notorious for
rebleeding, and he had a severe metabolic acidosis for
a period of time, you don't send this patient to the floor
. . . . He goes to the [intensive care unit (ICU)] or a
monitored environment . . . . If you don't have an ICU
bed you keep him in the postanesthesia care unit where
you can monitor. *It's totally outside the standard of
care to send a patient like this, no matter what he
looks like at the end of the operation, to a floor, and
especially if the floor does not monitor the patient
appropriately.*" (Emphasis added.)

In addition, Stahl testified that hospital personnel
deviated from the standard of care by administering
5000 units of heparin, an anticoagulant, to the victim
when he first arrived on the floor. Such treatment,

---

[1] Stahl, a graduate of Harvard Medical School, testified that he is a board
certified general surgeon, specializing in trauma surgery. At the time of his
testimony, he was the director of surgery at Lincoln Medical and Mental
Health Center (Lincoln) in the Bronx, and a professor and vice chairman
of the department of surgery at New York Medical College. Stahl testified
that Lincoln is one of the busiest trauma centers in the world. Since 1980,
Stahl has directed the surgical trauma service and the surgical intensive
care unit at Lincoln.

according to Stahl, was totally contraindicated and predisposed the patient to further bleeding. When the victim did begin to bleed again from the liver wound and was experiencing pain, Stahl indicated that he was given a narcotic that suppressed his reactions. Stahl testified that if the victim's vital signs, urine output and blood gases had been monitored properly, the bleeding "would have been detected before he died and could have been corrected."

Finally, Stahl testified that sending the victim to the floor with inadequate monitoring was gross negligence. In his opinion, this gross negligence supplanted any prior conduct that caused the patient to be treated in the hospital. According to Stahl, the victim had "a better than 90 percent chance of surviving" the liver wound, and "[t]his chance was taken away [by the hospital] . . . in the postoperative period."

The defendant also proffered the testimony of Cyril H. Wecht, a physician specializing in anatomic, clinical and forensic pathology. Wecht testified that the hospital's negligent care following the victim's removal from the postoperative recovery room caused his death. In Wecht's opinion, the victim had recovered well from surgery, despite the hospital's negligence in completely missing one stab wound in the liver and failing to diagnose a laceration in one of his lungs. According to Wecht, however, the situation took a turn for the worse thereafter as follows: "[A]t about 7 [p.m.] or so [that evening], instead of being sent to an [ICU] where he would be very carefully monitored, he was sent to . . . a regular floor room and when he went bad there was nobody there to pick it up immediately and to act upon it expeditiously. That is just something that is not done with a patient like this who has lost a lot of blood, who has had multiple stab wounds, who has undergone extensive surgical procedures, who is known to be a drug addict. That alone is a big red flag. These people

can have all kinds of problems including withdrawal. *This was in every respect a candidate for an [ICU] monitoring of a very tight surveillance.*" (Emphasis added.)

Wecht further testified that, in his opinion, the hospital's treatment constituted gross negligence, which supplanted any acts that had occurred prior to the victim's death. Because the victim had recovered well from the surgery, Wecht believed "that it was the gross negligence that occurred subsequent to 7 p.m. when he was sent to the floor . . . that led to his demise." Wecht also testified that administering heparin was contraindicated when the patient had been bleeding and the goal should have been to get his blood to clot.

The majority holds that the foregoing evidence was not admissible because it was not predicated upon an opinion by the physicians that the hospital's gross negligence was the sole proximate cause of the victim's death. We have never held, however, that the negligence of a third party must be the sole proximate cause of death in order to constitute a defense to homicide. Rather, this court held recently, in *State* v. *Munoz*, 233 Conn. 106, 124–27, 659 A.2d 683 (1995), in a unanimous opinion written by Justice Borden, that the third party's conduct need only be an efficient, intervening cause that supersedes the defendant's conduct as the cause of death in order to relieve a defendant of criminal liability.

We explained the doctrine of intervening cause in clear and precise language in *Munoz* as follows. "The doctrine of intervening cause, which has deep roots in the law of proximate cause, both criminal and civil, has been referred to several times in our case law. See *State* v. *Leroy*, [232 Conn. 1, 13, 653 A.2d 161 (1995)]; *State* v. *Spates*, [176 Conn. 227, 234, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 474 (1979)]; *State* v. *Alterio*, 154 Conn. 23, 30, 220 A.2d

451 (1966) ('independent and efficient cause'); *State* v. *Leopold*, 110 Conn. 55, 62, 147 A. 118 (1929) (same); *State* v. *Malines*, 11 Conn. App. 425, 433, 527 A.2d 1229 (1987) ('independent intervening force'). It refers to a situation in which the defendant's conduct is a 'but for' cause, or cause in fact, of the victim's injury, but nonetheless some other circumstance subsequently occurs—the source of which may be an act of the victim, the act of some other person, or some nonhuman force—that does more than supply a concurring or contributing cause of the injury, but is unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct. See generally 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.12 (f) (3). Thus, the doctrine serves as a dividing line between two closely related factual situations: (1) where two or more acts or forces, one of which was set in motion by the defendant, combine to cause the victim's injuries, in which case the doctrine will not relieve the defendant of criminal responsibility; and (2) where an act or force intervenes in such a way as to relieve a defendant, whose conduct contributed in fact to the victim's injuries, from responsibility, in which case the doctrine will apply. See *D'Arcy* v. *Shugrue*, 5 Conn. App. 12, 25, 496 A.2d 967, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985). Furthermore, in a case in which the evidence, viewed in favor of the defendant, justifies an instruction on the doctrine of intervening cause . . . *it will ordinarily be a question of fact for the jury . . . whether the subsequent circumstance constitutes a concurring or contributing cause, in which case the defendant will not be relieved of criminal responsibility, or an efficient, intervening cause, in which case he will be so relieved.*" (Citation omitted; emphasis added.) *State* v. *Munoz*, supra, 233 Conn. 124–25;[2] see also *State* v. *Leroy*, supra, 13 ("[i]n

[2] The majority distinguishes *Munoz* from the present case on two grounds. It first points out that the intervening force in *Munoz* was not the gross

short, a jury instruction with respect to proximate cause
must contain . . . an indication that the defendant's
conduct cannot have been superseded by an efficient,
intervening cause that produced the injuries").

In *Munoz*, we reversed the defendant's conviction
because the trial court failed to instruct the jury on the
doctrine of intervening cause. *State* v. *Munoz*, supra,
233 Conn. 122. The defendant in *Munoz* admitted that
he had stabbed the victim once, but the victim was
found inflicted with several stab wounds approximately
fifty yards away from where the defendant admitted to
having stabbed him, the victim had bled to death from
multiple stab wounds, and there was some evidence
that the defendant was somewhere else at the time
when the fatal wounds were inflicted. Id., 115–16. We
concluded that it was error for the trial court not to
have instructed the jury that "for the defendant to be
found guilty, 'the defendant's conduct cannot have been
superseded by an efficient intervening cause that pro-
duced' " the death of the victim. Id., 122. We noted, in
*Munoz*, that the evidence was susceptible to a number
of interpretations by the jury as follows: "(1) the defen-
dant's stabbing of [the victim] did not in any way cause
[the victim's] death because that stab wound was not
fatal . . . [and] the fatal stab wounds [were] inflicted
by someone else . . . (2) although the defendant
stabbed [the victim] . . . and although that stabbing
may have contributed substantially and directly to [the

---

negligence of the hospital, but, rather, that of another wrongdoer. Whether
the intervening force is that of another person or the gross negligence of
medical providers is not relevant. Second, the majority attempts to distin-
guish *Munoz* on the basis that, in that case, "the intervening criminal conduct
was the *sole* proximate cause of the victim's death." (Emphasis in original.)
That simply is not true. Rather, we concluded in *Munoz* that the trial court
should have left it to the jury to determine the extent to which wounds it
found to have been inflicted by the defendant were the cause of the victim's
death, and to what extent wounds that a third party might have inflicted
were the cause of the victim's death. *State* v. *Munoz*, supra, 233 Conn. 122.

victim's] death by virtue of providing one of the ultimately fatal stab wounds, some third party's conduct in inflicting additional stab wounds . . . was so significant that it amounted to an efficient, intervening cause; or (3) although the defendant stabbed [the victim] . . . the state's proof of whether that stabbing, as opposed to the stabbing of [the victim] by someone else . . . resulted in [the victim's] death was sufficiently inconclusive as to give rise to a reasonable doubt, based on the doctrine of efficient, intervening cause, about whether the defendant's conduct was the proximate cause of [the victim's] death." Id., 122–23. In *Munoz*, we did *not* hold that the act of a third party had to be the sole proximate cause of death, as the majority opinion now holds, but, rather, that it had to be an intervening cause.

The majority opinion confuses sole proximate cause with intervening cause as a result of dicta from *State v. Jacobs*, 194 Conn. 119, 479 A.2d 226 (1984), cert. denied, 469 U.S. 1190, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985). In *Jacobs*, this court stated in dicta that "[g]ross maltreatment by attending physicians constitutes a defense only in the exceptional case where that maltreatment is the sole cause of the victim's death." Id., 125–26. The negligence in *Jacobs* was not gross negligence and the court found that "[a]t best, the defendant's offer [tended] to show that the victim might have recovered if greater skill and care had been employed in his care and treatment." Id., 123–24 n.2. Thus, *Jacobs* was not a gross negligence case, and to rely on dicta from that case that is contrary to the law of intervening cause is inappropriate.

Indeed, the very treatise relied upon by the majority demonstrates this distinction. In their treatise, Professors LaFave and Scott, discussing causation, wrote: "Intervening Cause: Acts of a Third Person. The most common case involves the negligent treatment of

wounds by a doctor or nurse. A, intending to kill B, merely wounds him; but the doctor so negligently treats the wound that B dies. It is generally held that A is guilty of murdering B, i.e., that A's act legally caused B's death, unless the doctor's treatment *is so bad as to constitute gross negligence* or intentional malpractice." (Emphasis added.) 1 W. LaFave & A. Scott, supra, § 3.12 (f) (5).

In the present case, whether the hospital's treatment of the victim constituted gross negligence of the nature that would constitute an intervening cause was an issue that the defendant was entitled to have the jury decide. The testimony of Stahl and Wecht should have been admitted and the jury should have been instructed on intervening causation.

Even if the sole cause standard is correct, the issue of causation in this case was still a jury issue. Because causation is a factual element of the crime of murder—the crime that the defendant was charged with in this case—removal of the issue of causation from the jury's consideration violated the defendant's right to trial by jury and rendered the trial fundamentally unfair. *State* v. *Soucy*, 139 N.H. 349, 352, 653 A.2d 561 (1995). In a criminal trial, the burden is on the state to prove, beyond a reasonable doubt, all of the elements of the crime charged. "[A]ssertion of supervening cause is an effort to negate [the causal] link. If, in the presence of an alternate cause, the causal link remains, causation is established. If, in the presence of an alternative cause, the link is broken, causation is not established. Thus, if some evidence is offered, otherwise admissible, which is reasonably calculated to provide a reasonable doubt on the issue of causation, *it must be admitted, and the element of causation, with the supported defense, must be submitted to the jury.*" (Emphasis added.) Id., 353; see also *State* v. *Munoz*, supra, 233 Conn. 125.

The majority opinion is especially troubling because the decision as to the admissibility of the proffered evidence has constitutional underpinnings implicating the defendant's sixth amendment constitutional right to present a defense. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). The majority glosses over the constitutional implications, however, by labeling the trial court's ruling purely evidential. In ruling on the evidentiary issue of the admissibility of hearsay evidence, the Supreme Court of the United States has concluded: "Few rights are more fundamental than that of an accused to present witnesses in his own defense. . . . In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to [the petitioner's] defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." (Citations omitted.) *Chambers* v. *Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). Quite simply, the defendant in the present case had "the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 56, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987).

In my view, the testimony of the defendant's expert witnesses should have been allowed as relevant to the

issue of causation and the issue of causation should have been submitted to the jury to determine whether causation had been proven beyond a reasonable doubt.

Accordingly, I dissent.

KATZ, J., dissenting. I agree with parts I, II, IV and V of the majority opinion. I disagree, however, with part III. I would conclude affirmatively that expert opinion testimony that a homicide victim was likely to have behaved violently on a particular occasion as a result of being under the influence of drugs and alcohol is admissible where the defendant properly has raised the issue of self-defense and that the exclusion of such evidence in this case constituted reversible error. I, therefore, respectfully dissent.

I begin with a brief review of the facts as the jury reasonably could have found them. At noon on May 3, 1994, the defendant approached a bank of public telephones located on the New Haven town green. As he began to use one of the telephones, the victim, Michael Stewart, approached him and said, " 'Get off the phone. I beeped somebody.' " When the defendant continued to dial the telephone, the victim slapped his face. The defendant then punched the victim and a fistfight ensued.

Monique McNeil, an eyewitness, testified that the defendant, who was smaller in stature than the victim, appeared to be "winning" the fight. At some point during the fight, McNeil observed the victim reaching into a nearby trash can. The defendant testified that he had seen an object in the can and that he thought the victim was reaching to get a gun. The defendant further testified that he stabbed the victim in order to prevent him from retrieving the gun. McNeil testified that the fight escalated once the victim reached into the garbage can, but that she could not recall whether there was anything

in the victim's hand when it emerged from the garbage can.

Another eyewitness, Martin Tchakirides, who was seated in his car approximately forty to sixty feet away when the sound of raised voices drew his attention to the altercation, testified that neither party appeared to be winning the fight until the defendant pulled out a knife. He further testified that the victim had tried to pull away when the defendant brandished the knife. Tchakirides also testified that he saw the defendant making slashing motions with his hand.

Detective William Badger, a thirty year veteran of the New Haven police department, was on duty and was sitting nearby in his police car at the time of the fight. When he first noticed the altercation, the defendant was "straddling [the victim] like he was riding a horse." The victim was lying still at that point and did not appear to be fighting back. Badger saw the defendant stab the victim twice with a switchblade and Badger grabbed the defendant's arm as he was attempting to stab the victim a third time. Badger identified himself as a police officer and seized the knife from the defendant's hand. The defendant then stated to Badger that he was merely trying to defend himself. Badger testified that the defendant was cooperative and noncombative. The victim was then transported to Yale-New Haven Hospital, where he died approximately twelve hours later following surgery.

Malka Shah, the associate medical examiner who performed the autopsy on the victim's body, testified that he had bled to death as a result of stab wounds to his chest and abdomen. Shah also noted two "defensive wounds" on the victim's left arm. Shah further testified that certain needle marks on the victim's hand and elbow were not the result of medical treatment.

Detective Ralph DiNello, of the New Haven police department, testified that he advised the defendant of his rights and that the defendant agreed to speak with him regarding the stabbing incident. During this interview, the defendant claimed that he had stabbed the victim in self-defense but never mentioned that the victim had reached inside the trash can. When DiNello asked him whether the victim had a weapon, the defendant specifically replied that "he never saw nor was any other weapon used."

Hospital and autopsy reports indicated that the victim's body contained cocaine, morphine, meperidine[1] and alcohol, and that the victim had told nurses at the hospital that he was using five or six bags of heroin a day and drinking a six pack of beer daily. The defense proffered the testimony of James Merikangas, a neurologist and psychiatrist, who, based on his review of these records, stated that the victim's body contained morphine, cocaine and alcohol at the time of the altercation. Merikangas testified that the presence of morphine constitutes a positive test for heroin and that drug users simultaneously use opiates like morphine together with cocaine, which combination is called a "speedball." Merikangas further testified that, because of the presence of cocaine and alcohol in the victim's body, there was a high probability that the victim was the aggressor and that he was violent during the fight with the defendant. This testimony was offered for the purposes of showing that the victim was the aggressor, that the defendant did not have a duty to retreat and that it was reasonable for the defendant to use deadly force in self-defense.

---

[1] Cyril Wecht, a certified anatomical, clinical and forensic pathologist, testified that meperidine is the generic name for Demerol, which was administered to the victim at the hospital. Wecht characterized the remainder of the drugs as "substances of abuse that [the victim] had with him when he came to the hospital."

The trial court ruled that the expert testimony was inadmissible because: (1) it was undisputed that the victim was the initial aggressor; (2) it was not the type of opinion testimony that was admissible on this issue because it was not based on personal knowledge of the victim's character; and (3) the defendant had not established a sufficient foundation for the evidence. This ruling encompasses two distinct issues: first, whether evidence of the victim's violent character is admissible when the state has conceded that the victim initiated the fight; and second, if character evidence generally is admissible under that circumstance, whether expert opinion testimony that the presence of drugs and alcohol in the victim's blood made him more likely to be violent is an admissible form of character evidence. Finally, if this evidence is admissible, it must be determined whether the trial court's decision to exclude it requires reversal of this case.

I

I will first address the question of whether evidence of the victim's violent character is admissible for the purpose of proving self-defense when the state has conceded that the victim initiated the fight when he slapped the defendant. I would conclude that it is.

In order to be admissible, evidence must be both probative and material to the case. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable." (Citation omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995). In addition, "[e]vidence is admissible only to prove material facts, viz., those facts directly in issue or those probative of matters in issue; evidence offered

to prove other facts is 'immaterial.' " C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.1.2, p. 226.

"[T]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997). "The discretion accorded the trial court . . . though necessarily broad, is not unlimited. 'The trial judge's discretion, which is a legal discretion, should be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " *State* v. *Carter*, 228 Conn. 412, 421, 636 A.2d 821 (1994). The application of an incorrect legal standard by the trial court constitutes a clear abuse of discretion. *Unkelbach* v. *McNary*, 244 Conn. 350, 367, 710 A.2d 717 (1998) (trial court applied incorrect legal standard); see also *State* v. *Miranda*, 176 Conn. 107, 115, 405 A.2d 622 (1978) (although trial court applied legal standard in effect at time of trial, change of law on appeal necessitates reversal).

Balanced against the trial court's discretionary authority to determine the relevancy of evidence is the defendant's constitutional right to present a defense. "Consistent with the defendant's [constitutional] right fairly to inform the jury of facts material to the defense, [i]t has long been the law in this state that, in a homicide prosecution, an accused may introduce evidence of the violent, dangerous or turbulent character of the victim to show that the accused had reason to fear serious harm, after laying a proper foundation by adducing evidence that he acted in self-defense and that he was

aware of the victim's violent character. *State* v. *Miranda,* [supra, 176 Conn. 109], citing *State* v. *Padula,* 106 Conn. 454, 456–57, 138 A. 456 (1927). More recently, we joined a majority of courts when we expanded this rule to allow the accused to introduce evidence of the victim's violent character to prove that the victim was the aggressor, regardless of whether such character evidence had been communicated to the accused prior to the homicide. *State* v. *Miranda,* supra [109]. In *Miranda,* we determined that the victim's violent character could be proved by reputation testimony, by opinion testimony, or by evidence of the deceased's convictions for crimes of violence, irrespective of whether the accused knew of the deceased's violent character or of the particular evidence adduced at the time of the death-dealing encounter. Id., 114. . . . *State* v. *Smith,* 222 Conn. 1, 17–18, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992)." (Internal quotation marks omitted.) *State* v. *Carter,* supra, 228 Conn. 422–23.

When a defendant has established that, by disallowing evidence, the trial court improperly interfered with his constitutional right to present a defense, the state must demonstrate beyond a reasonable doubt that the violation was harmless. See id., 427–28. Where a nonconstitutional evidentiary ruling is concerned, however, "the defendant must show not only that the trial court improperly barred him from using [the proffered evidence], but also that the court's ruling caused him substantial prejudice. *State* v. *Hines,* [243 Conn. 796, 801, 709 A.2d 522 (1998)]; *State* v. *Small,* [242 Conn. 93, 109–10, 700 A.2d 617 (1997)]; *State* v. *Beliveau,* [237 Conn. 576, 592, 678 A.2d 924 (1996)]." *State* v. *Askew,* 245 Conn. 351, 371, 716 A.2d 36 (1998). Because I would conclude that the trial court abused its discretion in excluding the proffered testimony and that exclusion of this evidence resulted in substantial prejudice and

injustice, I do not reach the question of whether that decision deprived the defendant of his constitutional right to present a defense. See *State* v. *Genotti*, 220 Conn. 796, 804, 601 A.2d 1013 (1992) (court need not reach constitutional issue when issue disposed of on evidentiary and procedural grounds); *State* v. *Williams*, 200 Conn. 310, 322, 511 A.2d 1000 (1986) (constitutional issues not considered unless absolutely necessary to decision of case).

The relevancy of the proffered evidence in this case must be measured against the purpose for which it was offered; namely, to prove that the defendant acted in self-defense and that he justifiably used deadly force against the victim. "Pursuant to § 53a-19 (a) . . . a person may justifiably use *deadly* physical force in self-defense only if he *reasonably* believes *both* that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, *and* (2) that deadly physical force is necessary to repel such attack. *State* v. *DeJesus*, 194 Conn. 376, 389 n.13, 481 A.2d 1277 (1984); see also *State* v. *Carter*, 232 Conn. 537, 546, 656 A.2d 657 (1995)." (Emphasis in original.) *State* v. *Prioleau*, supra, 235 Conn. 285–86. Section 53a-19 (b) (1) provides further that the use of deadly force is not justified if the defendant "knows that he can avoid the necessity of using such force with complete safety . . . by retreating . . . ."

The state argues that this court's decision in *Miranda* permits the defendant to introduce evidence of the victim's violent character, without showing the defendant's awareness of that trait, only for the purpose of proving that the victim was the *initial* aggressor. Because it has conceded that the victim started the altercation, the state argues that the proffered evidence is inadmissible. I disagree.

I begin by noting that the state's concession that the victim started the altercation does not, by itself, render

the proffered evidence irrelevant to that specific issue. The mere fact that one party has conceded an issue does not bar the opposing party from introducing corroborating evidence on that point. C. Tait & J. LaPlante, supra, § 6.8.1, pp. 136–37; see also *Wagner* v. *Clark Equipment Co.*, 243 Conn. 168, 195, 700 A.2d 38 (1997) (evidence admissible to corroborate other direct evidence in case); *State* v. *Campbell*, 93 Conn. 3, 8–9, 104 A. 653 (1918) (opposing party not required to dispense with own proof). The defendant may, therefore, introduce evidence tending to corroborate the fact that the victim, without provocation, initiated the fight when he slapped the defendant.

Additionally, it is significant that the state conceded only that the victim had initiated the fight, not that he remained the aggressor when the defendant pulled out a knife and stabbed the victim. The fact that the victim was the first to use physical force may, arguably, be enough to raise the issue of self-defense, but it is not sufficient to absolve the defendant of criminal liability. "It is not the law . . . that the person who first uses physical force is necessarily the *initial aggressor* under § 53a-19 (c) (2)." (Emphasis added.) *State* v. *Jimenez*, 228 Conn. 335, 340, 636 A.2d 782 (1994). The issue is, therefore, not who was the first to use physical force but whether, at the relevant time during the altercation, the defendant was justified in using deadly force. The state's concession that the victim started the fight is, therefore, unresponsive to the purpose for which the defendant sought to introduce the proffered evidence.

Furthermore, it is significant that the defendant in the present case seeks to excuse, not merely the use of force, but the use of *deadly* force as provided in § 53a-19. Under the terms of that statute, the defendant will not be excused from criminal liability unless he did not have a duty to retreat and unless his use of deadly force was authorized under the circumstances.

In *Miranda*, this court characterized the question of who was the aggressor as "vital" because it was contested and because the evidence was offered to prove that specific point. *State* v. *Miranda*, supra, 176 Conn. 110. There is nothing in the language of that opinion, however, indicating that the court's reasoning may not apply equally to other contested issues that are "vital" to the defendant's claim of self-defense. The question of whether the defendant had a duty to retreat under the circumstances and whether he was justified in using deadly force are necessary factors in a claim of self-defense and, therefore, are "vital" to that defense. A concession by the state as to the question of who initiated the altercation does not negate the importance of these other "vital" issues.

Evidence of the degree of the victim's aggressiveness would be probative as to the issue of the amount of force necessary for the defendant to repel the attack and as to the likelihood that he could retreat with complete safety. Although a component of the issue of whether the defendant had a duty to retreat and whether it was appropriate to use deadly force necessarily hinges on what the defendant believed to be necessary, his ability to prove that his actions were justified depends, to a large degree, on what the jury believed the victim actually did. As this court stated in *Miranda*, in connection with that portion of the opinion holding that the defendant need not know of the victim's violent character, "the question is what the deceased probably did, not what the defendant probably thought the deceased was going to do. The inquiry is one of objective occurrence, not of subjective belief." (Internal quotation marks omitted.) Id. If the jury believed the victim was violent, then it would have been more likely to credit the defendant's testimony that he reasonably feared for his life when the victim deliberately reached into a garbage can to retrieve what the defendant thought was a

weapon, and that the defendant did not believe that he could retreat with complete safety. I would conclude that, despite the state's concession that the victim had been the first to use physical force, evidence of the victim's violent character was relevant to show that he was the aggressor and that he was likely to behave violently.

II

I next address the question of whether the expert opinion testimony offered in this case is an admissible form of character evidence. The state argues that, although opinion testimony is generally admissible to prove the victim's character for violence, expert opinion testimony of the kind offered by this defendant is not admissible because it is not based on personal knowledge of the victim's character.

Where character evidence is otherwise admissible, it may take the form of opinion testimony. "In *theory*, a trait of character may be proved in three ways: (1) by testimony concerning the individual's reputation in the community as to the trait; (2) by testimony of those who have had an opportunity to form, and have formed, an opinion as to whether the individual possessed the trait; and (3) by evidence of specific acts of the individual under similar circumstances, from which the existence of the character trait may be inferred. . . .[2] Although the second method is not allowed in a number of states, Connecticut adopted it in *Richmond* v. *Norwich*, 96 Conn. 582, 594, 115 A. 11 [1921], on the rationale that '[p]ersonal observation and personal knowledge are a more trustworthy reliance than general reputation.' " (Citations omitted; emphasis added.) *State* v. *Miranda*, supra, 176 Conn. 111–12. The state

[2] In *State* v. *Smith*, supra, 222 Conn. 18, we held that "the deceased's violent character may not be established by evidence of specific violent acts, other than convictions."

argues that, although opinion testimony is generally admissible, expert opinion testimony of the type offered is not admissible because it is not based on personal knowledge of the victim's character. I disagree.

This court has stated explicitly that the "degree of inebriation" of the victim is relevant where the defendant has claimed self-defense. *State* v. *Gooch*, 186 Conn. 17, 23, 438 A.2d 867 (1982). Evidence of the victim's drug use has been held not to support a claim of self-defense, however, when the amounts found in the victim's bloodstream were insufficient to show that the victim was under the influence of drugs or alcohol at the time of death; *State* v. *Walton*, 41 Conn. App. 831, 838–39, 678 A.2d 986 (1996) (excluding evidence of cocaine breakdown products in victim's blood showing that victim had ingested cocaine " 'many hours' " before death); and when no evidence was offered as to whether trace amounts of drugs found in the victim's body bore on the issue of who was the aggressor. *State* v. *Bember*, 183 Conn. 394, 406, 439 A.2d 387 (1981);[3] cf. *State* v. *Smith*, supra, 222 Conn. 18 (although evidence of victim's intoxication admitted at trial, evidence of violent act occurring hours before shooting properly excluded). In the present case, however, there was evidence offered suggesting that the victim was under the influence of drugs at the time of the incident and not merely that he had ingested some drugs many hours before death. Merikangas testified, based on the toxological evidence, that the victim's body contained sufficient quantities of cocaine, morphine and alcohol at the

---

[3] In *State* v. *Johnson*, 139 Conn. 89, 91, 90 A.2d 905 (1952), we noted the presence of alcohol in the victim's blood and the defendant's testimony that the victim was quarrelsome when under the influence of alcohol. This decision antedates *State* v. *Miranda*, supra, 176 Conn. 114, wherein we first articulated our adoption of the rule that the victim's violent character may be proved by reputation evidence regardless of whether the defendant was aware of that reputation. We, therefore, determined in *Johnson* that the victim's reputation was irrelevant to the issue of the defendant's guilt

time of the altercation to cause him to behave violently. I would, therefore, conclude that evidence of the presence of drugs and alcohol in the victim's body at the time of the altercation is admissible for the purpose of supporting the defendant's self-defense claim.

I now turn to the question of whether expert opinion testimony linking the presence of drugs and alcohol in the victim's body to his violent behavior is an admissible form of character evidence when offered to show that the defendant justifiably used deadly force in self-defense. The state argues that Merikangas' statements are inadmissible because his opinion was not based on personal knowledge of the victim's character. I disagree.

"Generally, expert testimony is admissible if (1) the witness has special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." *State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986). The question of how particular quantities of various chemical substances affect a person's propensity for violence requires specialized medical knowledge that would not be within the jury's understanding. Expert testimony is ordinarily not just permitted, but required under such circumstances. See, e.g., *Collette* v. *Collette*, 177 Conn. 465, 471, 418 A.2d 891 (1979). Such testimony need not be based on a direct examination of the patient. *Shelnitz* v. *Greenberg*, 200 Conn. 58, 67, 509 A.2d 1023 (1986). Furthermore, "[a]n expert opinion or conclusion need not be based on absolute certainty so long as the opinion is stated in terms of the probable and not merely the possible." C. Tait & J. LaPlante, supra, § 7.16.1, p. 172.

because the evidence did not indicate that the defendant was aware of that reputation. *State* v. *Johnson*, supra, 93.

In the present case, Merikangas spoke from knowledge that this particular defendant had significant amounts of a variety of illegal substances in his bloodstream at the time of the altercation and that he habitually used five bags of heroin and drank a six pack of beer daily. Additionally, Merikangas testified as to the synergistic effect such drugs would have on violent behavior. On the basis of specific information about the victim, he testified that "alcohol reduces one's impulse control and chronic alcohol reduces it more, and cocaine, particularly, acutely causes violence . . . ." Merikangas specifically stated that there was a high probability that the victim was the aggressor and that he was violent. This evidence is probative of whether and to what extent the victim was likely to behave in an aggressive and violent manner and tends to corroborate the defendant's own testimony that he felt it was necessary to stab the victim in order to save himself.

Merikangas' knowledge of the victim was sufficient to allow him to render an expert opinion on the effect that specific quantities of drugs and alcohol would likely have on the victim. In *State* v. *Miranda,* supra, 176 Conn. 112, this court noted that opinion testimony offered to prove the victim's character for violence is particularly reliable because it is based on personal knowledge of the defendant rather than on general reputation. Furthermore, it is permissible to base expert opinion testimony on knowledge gleaned from hospital records rather than from a physical examination of the subject. *Shelnitz* v. *Greenberg,* supra, 200 Conn. 67. I would conclude, therefore, that expert opinion testimony of the type proffered by this defendant was admissible to prove that a homicide victim was likely to have been violent.

For the foregoing reasons, I also would conclude that the defendant has laid a proper scientific foundation

for this expert opinion testimony.[4] The state has not claimed that Merikangas was not qualified to render an opinion on the relationship between drugs and violence. The only remaining issue, therefore, is whether Merikangas based his opinion on appropriate facts under the circumstances of this case. As I have already stated, Merikangas based his opinion on specific knowledge that this particular victim was, by his own admission and as corroborated by forensic evidence, under the influence of alcohol, cocaine and heroin at the time of the altercation. On the basis of his professional training and experience, Merikangas concluded that the combination of drugs and alcohol in the victim's system at the time of the altercation made it highly probable that he had been violent at the time in issue.

Furthermore, Merikangas did not reach the ultimate question of whether the victim's behavior was such that the defendant's use of deadly force was justified under the circumstances. Contrast *State* v. *Walton*, 227 Conn. 32, 59–61, 630 A.2d 990 (1993). Nor did he reach the question of whether the victim was likely to have attempted to use a weapon during the fight. He stated his opinion more generally in terms of the probability that the victim would behave in a violent manner. Although such testimony allows the fact finder to draw

---

[4] I note that the defendant claimed affirmatively that a proper foundation had been laid for Merikangas' testimony but did not set forth the arguments supporting that claim separately from those relating to the general question of the admissibility of expert opinion testimony linking the victim's intoxication to his propensity for violence. Because these issues overlap to a substantial degree and because the appellant is not required to be redundant, I treat the argument as having been briefed adequately. See *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 255 n.38, 694 A.2d 1319 (1997) ("argument, albeit brief, adequately [set] forth both the relevant factual basis and legal authority"). Although I recognize that it is the defendant's burden to address the question of whether the trial court properly concluded that he had not laid a proper foundation for the proffered testimony, I note that the state has not defended the trial court's exclusion of the evidence based upon an improper foundation.

an inference that the victim was *actually* violent on a particular occasion based on testimony that merely indicates that violent behavior was *likely*, this argument is no more applicable to expert opinion testimony than it is to other forms of character evidence, which we have already concluded are properly admissible. *State v. Miranda*, supra, 176 Conn. 111–12. Furthermore, the evidence in this case of drug and alcohol ingestion and Merikangas's expertise regarding its effects on human behavior, all of which served as the basis for his opinions, were more accurate and precise than the factors generally relied upon for other forms of admissible character evidence. See id.

Finally, even when an expert renders an opinion based on a hypothetical question that does not include all relevant evidence, his testimony is permitted so long as the question does not misrepresent the facts or mislead the fact finder. *Shelnitz* v. *Greenberg*, supra, 200 Conn. 77–78. This is so because it is the function of cross-examination to reveal any weaknesses in such testimony by changing or adding to the variables relied upon by the expert witness. *Pischitto* v. *Waldron*, 147 Conn. 171, 177, 158 A.2d 168 (1960) ("[c]ross-examination of an expert . . . often brings out the effect . . . which would or should result if one or more of the facts assumed were eliminated or if additional facts were assumed"). The state has not claimed that the facts relied upon by Merikangas were untrue or misleading. As such, any assertion that Merikangas' testimony was based on improper or unstated assumptions would more properly have been addressed through cross-examination or through the presentation of opposing expert testimony than through exclusion of the evidence. I, therefore, would conclude that the expert opinion testimony offered by the defendant was admissible.

## III

I turn finally to the question of whether the trial court's exclusion of the evidence, even if improper, entitles the defendant to a new trial. It has long been required that, in order to be entitled to a new trial, the defendant must demonstrate that the trial court's ruling was "both wrong and harmful." *DeCarufel* v. *Colonial Trust Co.*, 143 Conn. 18, 21, 118 A.2d 798 (1955). The state argues that, even if the proffered testimony is admissible, the defendant cannot demonstrate that he was harmed by the trial court's ruling. I disagree.[5]

As I previously have stated, the defendant's right to present evidence of the victim's violent character is

---

[5] I would conclude that the defendant was prejudiced substantially by the trial court ruling, regardless of how that is measured. It appears that the case law in Connecticut is inconsistent with respect to the proper standard of review to apply to erroneous evidentiary rulings. Although the cases uniformly hold that, where the error is not of constitutional magnitude, the appellant bears the burden of proving that the trial court's ruling warrants reversal and a new trial, it is unclear what the appellant must show in order to meet that burden. Earlier cases required the defendant to show that the ruling was "both wrong and harmful." See, e.g., *DeCarufel* v. *Colonial Trust Co.*, supra, 143 Conn. 21. Several of those cases noted that "[i]f the ruling could not reasonably have affected the verdict, it is not harmful." Id.; see, e.g., *State* v. *Tropiano*, 158 Conn. 412, 427, 262 A.2d 147 (1969), cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288 (1970); *State* v. *Beaudet*, 53 Conn. 536, 539, 4 A. 237 (1886). Subsequently, that language was recast in terms of an affirmative obligation on the part of the defendant to prove that the claimed erroneous action of the court would have been likely to affect the result. See, e.g., *Higgins* v. *Karp*, 243 Conn. 495, 506, 706 A.2d 1 (1998); *State* v. *Esposito*, 235 Conn. 802, 825, 670 A.2d 301 (1996); *State* v. *Paulino*, 223 Conn. 461, 478, 613 A.2d 720 (1992); *State* v. *Vilalastra*, 207 Conn. 35, 47, 540 A.2d 42 (1988); *State* v. *McClain*, 171 Conn. 293, 300, 370 A.2d 928 (1976). A number of cases addressing nonconstitutional evidentiary errors, however, have not stated that the defendant must prove that the result would have been different but have stated merely that the defendant must prove " 'substantial prejudice or injustice.' " *State* v. *Beliveau*, 237 Conn. 576, 592, 678 A.2d 924 (1996); see, e.g., *State* v. *Small*, 242 Conn. 93, 110, 700 A.2d 617 (1996); *State* v. *Colton*, 227 Conn. 231, 260, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996); *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991). More recently, the standard has

rooted in his constitutional right to present a defense; *State* v. *Carter*, supra, 228 Conn. 422–23; and evidence of the victim's propensity for violence is "vital" to the defendant's claim of self-defense. *State* v. *Miranda*, supra, 176 Conn. 110. Although other witnesses testified that the victim initiated the fight, this argument is unresponsive to the defendant's claim that his right to use deadly force arose, not when the fight started, but when the victim apparently tried to retrieve a weapon from a garbage can during the fight. McNeil corroborated the defendant's testimony that the victim deliberately reached into the garbage can and testified that the fight escalated at that point. Tchakirides was forty to sixty feet away when he noticed the fight and Badger was

been refined to require that the defendant prove that the trial court's ruling resulted in substantial prejudice and that it undermined confidence in the outcome of the trial. *State* v. *Askew*, supra, 245 Conn. 371–72.

Although it is not clear what the defendant must prove in order to satisfy each of these standards, this court has stated explicitly that the applicable standard of review is not equivalent to that by which we evaluate the sufficiency of the evidence. In *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990), this court stated that denying reversal where other, properly admitted evidence was sufficient to sustain the verdict, a standard was "too restrictive in that it does not encompass situations where the erroneously admitted evidence, while not necessary itself to sustain the jury's verdict, may nonetheless have affected the jury's perception of the remaining evidence. Such a standard is inappropriate because it would require that we treat as harmless error any evidentiary ruling, regardless of its effect upon the verdict, so long as the evidence not implicated by the ruling was sufficient as a matter of law to sustain the verdict." Because this court's "review of evidential rulings, whether resulting in the admission or exclusion of evidence" is the same; *Casalo* v. *Claro*, 147 Conn. 625, 630, 165 A.2d 153 (1960); *Swenson* is equally applicable to the present case, where the trial court's ruling resulted in the exclusion of evidence. This language shows quite clearly that it is not enough merely to show that other, properly admitted evidence, was sufficient to sustain the verdict. *Swenson* recognized that individual pieces of evidence do not exist in a vacuum and acknowledged that a piece of evidence, seemingly unimportant in its own right, may affect the fact finder's interpretation of other highly significant evidence. *Swenson* v. *Sawoska*, supra, 153; cf. *Costello* v. *Costello*, 134 Conn. 536, 544, 59 A.2d 520 (1948) (where erroneous evidentiary rulings do not relate to evidence that "reasonably could have affected the verdict," reversal not warranted).

thirty feet away. None of the witnesses was able to testify as to what the victim did as he was reaching into the can. The proffered testimony provides a critical link between the victim's physical condition at the time of the altercation and the likelihood that he would behave in a violent manner. I, therefore, believe that we cannot say that the evidence was unrelated to "evidence which reasonably could have affected the verdict . . . ." *Costello* v. *Costello*, 134 Conn. 536, 544, 59 A.2d 520 (1948).

The state argues that, because the defendant introduced the victim's 1990 conviction of one count of threatening pursuant to General Statutes § 53a-62, the proffered evidence was cumulative.[6] I disagree. Evidence of the victim's drug and alcohol use at the precise time of the altercation is not sufficiently comparable to a four year old misdemeanor conviction to render the former cumulative. Unlike other forms of character evidence, such as prior criminal convictions, the proffered testimony relates specifically to the victim's physical state at the time of the altercation and is therefore particularly probative of whether and to what extent the victim was likely to have engaged in violent behavior at the relevant time. See *State* v. *Delgado*, 8 Conn. App. 273, 283, 513 A.2d 701 (1986) (noting that character evidence relating to events close in time to altercation is "of a distinct and different order" than evidence relating to remote past).

Moreover, the case against the defendant was not overwhelming. The victim, who was larger than the

---

[6] Whether proffered evidence is cumulative is relevant to the issue of whether the prejudicial nature of that evidence substantially outweighs its probative value as well as to the question of whether the exclusion of the evidence will be held to be harmless. Because the trial court did not analyze the probative value or prejudice resulting from the admission of the evidence, however, I address the question of whether the evidence was cumulative only in the latter context.

defendant, initiated the fight, continued the altercation, and, as one state's witness acknowledged, apparently deliberately reached into a garbage can during the fight. The state's witnesses, Tchakarides and Badger, contradicted one another as to whether the defendant was "winning" the fight before the victim reached into the garbage can. Evidence that the victim was under the influence of illegal drugs at the time of the altercation and that this condition made it highly probable that he would behave violently, would likely have influenced the jury's decision as to whether the defendant was correct in his assessment that the victim was attempting to retrieve a weapon. Had the jury heard the expert testimony in question and found that the victim was the aggressor and was violent during the altercation, it reasonably could have concluded that the defendant was justified in his use of deadly force and, therefore, was not guilty of murder.

Even if the jury had decided that the defendant properly acted in self-defense but that he had used excessive force, the jury, nevertheless, could have concluded that the defendant was guilty of first degree manslaughter, either based upon an intent to cause serious physical injury or based upon recklessness. See *State* v. *Maselli*, 182 Conn. 66, 73, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981).[7] The

[7] The majority states that this case is comparable to *State* v. *Munoz*, supra, 233 Conn. 114–15 n.5, and *State* v. *Person*, 236 Conn. 342, 359, 673 A.2d 463 (1996) (*Borden, J.*, concurring), in which it was noted that the presentation of inconsistent defenses might reasonably cause a jury to become skeptical about the defendant's entire case. In *Person*, the trial court erroneously refused to charge the jury on the defense of extreme emotional disturbance where the defendant's own testimony contradicted the claim that he was emotionally upset at the relevant time. *State* v. *Person*, supra, 356. In *Munoz*, the defendant claimed that he had stabbed the victim in self-defense, though not fatally, that he had an alibi for the time of death and that someone else had delivered the fatal blow. *State* v. *Munoz*, supra, 114–15. By contrast with those cases, the defenses in the present case are not necessarily inconsistent. The defendant is not claiming both that he stabbed the victim in self-defense and that someone else actually committed the crime. He is,

evidence was clearly sufficient to support a finding that the defendant intended to cause serious physical injury. Similarly, the defendant's avowedly intentional stabbing of the victim constituted reckless conduct creating a grave risk of death to the victim under circumstances evincing an extreme indifference to human life, as proscribed by General Statutes § 53a-55 (a) (3). Because "[i]t is the facts as they reasonably appear to the defendant at the time he acted which measure the existence of the right of self-defense . . . [t]he jury might well have concluded that for the defendant to have believed under the circumstances revealed by the evidence that the victim was about to use deadly force upon him so that it was necessary to [repeatedly stab the victim] was such a gross deviation from the standard of conduct that a reasonable person would observe in the situation as to constitute recklessness. General Statutes § 53a-3 (13)." (Internal quotation marks omitted.) *State* v. *Maselli*, supra, 73 (firing eight shots at point blank range constituted recklessness). I would note that both the defendant and the state requested a jury instruction on the lesser included offenses of first degree intentional and reckless manslaughter, and that the trial court charged in accordance with these requests. The precluded evidence bore directly on the jury's ability to consider these options in a meaningful way. I would conclude, therefore, that the trial court's decision in this case caused the defendant substantial prejudice.

Finally, the state should not have been surprised and would not have been prejudiced by the introduction of the proffered testimony. This court has, in the past, noted the relevancy of evidence of the victim's intoxication where the defendant has claimed self-defense. Additionally, the state had equal access to the victim's

---

instead, making two related but not inconsistent claims regarding his mental state at the time that he, admittedly, stabbed the victim.

medical records and could have cross-examined Meri-kangas or presented testimony refuting his conclusions. The trial court, therefore, abused its discretion when it excluded expert testimony that the level of drugs and alcohol present in the victim's body would have made him more likely to be violent at the time of the altercation. See *Unkelbach* v. *McNary*, supra, 244 Conn. 367 (erroneous application of law constitutes abuse of discretion).

By way of summation, I would conclude that the trial court incorrectly applied the law in holding: (1) that the proffered evidence was inadmissible because the state had conceded that the victim initiated the fight; (2) that expert opinion testimony linking the victim's drug and alcohol use at the time of the altercation was inadmissible; and (3) that the defendant had not laid a proper foundation for the proffered testimony. I, therefore, respectfully dissent from part III of the majority opinion.